UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 3:20-cr-72-AWT |
| v. ) | No. 3:12-cr-23-AWT |
| ) | |
| JONATHAN TORRES ) | February 22, 2021 |
| ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Jonathan Torres awaits sentencing via Zoom on March 4, 2021. Arrested April 16, 2020, Mr. Torres has spent the first year of his sentence in prison during a pandemic. Counsel has met with him in person just one time, for about 10-15 minutes. Each of us wore masks, and we stood in opposite corners of the room, raising our voices a bit to be heard. These are not normal times.

Remove the pandemic, and this case begins to line up with many seen in federal court. For example, Mr. Torres was on supervised release. He struggled financially, and he struggled with substance abuse. He tried to make things work with immediate "family," comprised of his girlfriend and her kids, for whom he filled the role of father. He also tried to maintain connections with his siblings and other family members.

His personal history also is all too familiar in terms of the poverty, the lack of education, the exposure to violence, drug trafficking, and other criminal activity. His history with his mother is somewhat salient, in that Mr. Torres appears to have learned his behaviors at home, as reflected in many areas, including that they were codefendants in his prior federal case. Mr. Torres still loves her, as he does the family and friends that he longs to help but who either cause or permit his downfalls.

Mr. Torres's financial struggles, active drug addiction, and poor decisionmaking led to short cuts to make money, and his exposure to violence (he was shot in 2019) interlaced his possession of a firearm.  The extent of Mr. Torres's addiction and decisonmaking appears to place him in a sub-group of addicts where a positive drug test should yield an immediate return to the courtroom.  While many addicts struggle with success, failure, relapse, etc., and are best served by the gradual steps of outpatient treatment, then intensive outpatient treatment, and then in-patient treatment, Mr. Torres needs more help and more supervision.  He had an opportunity, especially when released following his arrest for possessing a firearm, and he could not handle it.

Given these circumstances, a Guidelines sentence appears appropriate.  Mr. Torres requests that the Court depart to the Guidelines range in the plea agreement, 46-57 months (the PSR has a higher criminal history category, resulting in a range of 57 to 71 months). The Guidelines range for the violation is 18-24 months.  In recognition that the pandemic has caused Mr. Torres to experience a more punitive and less rehabilitative period of time in prison, and with prison conditions hopefully improving but the end of the pandemic not yet certain, the Court should run the sentence on for the violation concurrent, such that Mr. Torres's total sentence is no greater than 60 months.  That term will serve to punish Mr. Torres and, to some extent deter him, although that latter purpose may be better served by conditions of supervised release that steer him more directly towards his rehabilitation, and for which the intentional failure to comply should receive little tolerance.

**ARGUMENT**

**I.     THE BASIC SENTENCING FRAMEWORK**

The Court must impose a sentence that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). Title 18, United States Code § 3553(a) provides a litany of factors for the Court to consider in making its determination of a reasonable sentence, of which the following are the most pertinent here:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

    A. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    B. to afford adequate deterrence to criminal conduct;

    C. to protect the public from further crimes of the defendant; and

    D. to provide the defendant with needed education or vocation training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentence available;

(4) the kinds of sentence and sentencing range established for –

    A. the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines

    B. .     .     .     .

(5) any pertinent policy statement –

    A. issued by the Sentencing Commission . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; . . .

**II.    SEVERAL FACTS IMPACT THE APPLICATION OF THE 3553(a) FACTORS IN DETERMINING A SUFFICIENT SENTENCE.**

**A.    "[T]he nature and circumstances of the offense" Are Significant But Should Not Be Overly Determinative.**

The first sentencing factor, 18 U.S.C. § 3553(a)(1), can be broken into several components of significance here, starting with "the nature and circumstances of the offense." Mr. Torres pled guilty to one count of possession with intent to distribute and distribution of fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and one count of unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). There is no mandatory minimum prison term, and the maximum term is 20 years for fentanyl distribution and 10 years for the unlawful firearms possession, with at least three years of supervised release to follow. There are no issues concerning violence, although the risks associated with possessing firearms in a car and with fentanyl are noteworthy.

That this case involves drug dealing and his prior federal case involved drug dealing prompts comparison. The circumstances of the offenses are different. In the prior case, Mr. Torres was subject to an investigation that involved 400-700 grams of heroin, and he was committing the offense with his mother, largely operating out of their home. This time, there were a number of controlled purchases that occurred in more than one location and involved smaller quantities, totaling approximately 16 to 24 grams of fentanyl. *See* Plea Agreement, ECF No. 34, at 4. Unlike last time, which involved quantities triggering a 5-year minimum, the parties determined that the resulting Guidelines range for the distribution charge would be 30-37 months (albeit with the lower criminal history category determined by the parties at the time of Mr. Torres's guilty plea). *See id.* at 5.

Here, there is the additional count for Mr. Torres for his unlawful possession of a firearm. In his prior case, although not a subject of his plea agreement, there was evidence to indicate that Mr. Torres intended to purchase 4 firearms. See PSR, ¶ 42. The circumstances here, having possession of a firearm in a glove box while with others and there being evidence of drug dealing, connote a different type of risk, but the prior event involved a potential exchange of 20 grams of raw heroin for the firearms, after prior controlled purchases for 20 grams of the same.

The circumstances in the present clearly are serious but also less serious than in the prior case. The absence of a mandatory minimum term evidence that point, but so do a comparison of the scope of the activity, the quantities involved, and that Mr. Torres's more recent offense does not involve a number of codefendants and other participants. The firearm conduct is different, but present in both instances and which is more concerning is debatable. Mr. Torres had been shot prior to his possession in February; while providing some context for his possession, the law plainly does not recognize those circumstances as excusing his possession. Here, though, the firearm plays a significant role in the Guidelines calculation, providing the basis for the offense level calculations, including a significant 4-level enhancement due to the firearm having been possessed in connection with another felony.

In sum, the more recent offense conduct *is* serious, but the statutory scheme does not limit the Court's statutory discretion to a mandatory minimum prison term. The Guidelines recommend a lower range in this case than in the prior one, and that lower range appropriately reflects the lesser conduct. The prior sentence should not, therefore, particularly influence the sentence, especially given that the Guidelines already reflect that

prior conviction in determining the base offense level (raising it from 14 to 20) and the criminal history category (providing five points towards the total; three points for the sentence and two points for the instant offense occurring while on supervised release).-

### B. "[T]he history and characteristics of the defendant" Impact The Calculation Significantly.

The second component of the first sentencing factor, 18 U.S.C. § 3553(a)(1), requires that the Court, to the extent possible, take a close examination of who the defendant is, apart from the conduct at issue in the case at hand. Several considerations impact the analysis here.

For example, the Court of Appeals and even the Guidelines recognize that in extraordinary circumstances, childhood experiences, particularly abuse, can impair a person's mental and emotional conditions to the point that this background contributes to the defendant's commission of the offense. *See United States v. Rivera*, 192 F.3d 81, 84 (2d Cir. 1999); *see also United States v. Floyd*, 945 F.2d 1096 (9th Cir. 1991) (affirming departure from guideline range of 30 years to 17 years because of defendant's abandonment by his parents and lack of guidance as a youth, rendering defendant less culpable). Even without a finding that a defendant's mental or emotional conditions are impaired, courts have recognized that a defendant's tragic personal history may warrant a departure. *See United States v. Lopez*, 938 F.2d 1293, 1297-99 (D.C. Cir. 1991) (remanding for consideration of departure where defendant was exposed to significant violence as a youth, including his mother being murdered by his stepfather, and grew in slums).

As the courts have recognized, the adversity of youth is not something that any one person can just choose to overcome. Similarly, studies today inform that assessing someone

6

is no longer just looking at a person's immediate circumstances and the decisions made in a particular moment.

> Although genetic variability clearly plays a role in stress reactivity, early experiences and environmental influences can have considerable impact. Beginning as early as the prenatal period, both animal and human studies suggest that fetal exposure to maternal stress can influence later stress responsiveness. In animals, this effect has been demonstrated not only in the offspring of the studied pregnancy but also in subsequent generations. The precise biological mechanisms that explain these findings remain to be elucidated, but epigenetic modifications of DNA appear likely to play a role.
>
> Early postnatal experiences with adversity are also thought to affect future reactivity to stress, perhaps by altering the developing neural circuits controlling these neuroendocrine responses. Although much research remains to be performed in this area, there is a strong scientific consensus that the ecological context modulates the expression of one's genotype. It is as if experiences confer a "signature" on the genome to authorize certain characteristics and behaviors and to prohibit others. This concept underscores the need for greater understanding of how stress "gets under the skin," as well as the importance of determining what external and internal factors can be mobilized to prevent that embedding process or protect against the consequences of its activation.

Jack P. Shonkoff, MD, et al, *Technical Report, The Lifelong Effects of Early Childhood Adversity and Toxic Stress*, AMERICAN ACADEMY OF PEDIATRICS (2012), at e235 (emphasis added).

Likewise, past assumptions that children will, in essence, "grow out of it" are no supportable.

> Within this same context, the health dimension of early childhood policy has focused largely on the traditional components of primary pediatric care, such as immunizations, early identification of sensory impairments and developmental delays, and the prompt diagnosis and treatment of medical problems. That said, as advances in the biomedical sciences have generated growing evidence linking biological disruptions associated with adverse

childhood experiences (ACE) to greater risk for a variety of chronic diseases well into the adult years, the need to reconceptualize the health dimension of early childhood policy has become increasingly clear. Stated simply, the time has come to expand the public's understanding of brain development and shine a bright light on its relation to the early childhood roots of adult disease and to examine the compelling implications of this growing knowledge base for the future of pediatric practice.

The potential consequences of toxic stress in early childhood for the pathogenesis of adult disease are considerable. At the behavioral level, there is extensive evidence of a strong link between early adversity and a wide range of health-threatening behaviors. At the biological level, there is growing documentation of the extent to which both the cumulative burden of stress over time (eg, from chronic maltreatment) and the timing of specific environmental insults during sensitive developmental periods (eg, from first trimester rubella or prenatal alcohol exposure) can create structural and functional disruptions that lead to a wide range of physical and mental illnesses later in adult life. A selective overview of this extensive scientific literature is provided below. The association between ACE and unhealthy adult lifestyles has been well documented. Adolescents with a history of multiple risk factors are more likely to initiate drinking alcohol at a younger age and are more likely to use alcohol as a means of coping with stress than for social reasons. The adoption of unhealthy lifestyles as a coping mechanism might also explain why higher ACE exposures are associated with tobacco use, illicit drug abuse, obesity, and promiscuity, as well as why the risk of pathologic gambling is increased in adults who were maltreated as children.

Adolescents and adults who manifest higher rates of risktaking behaviors are also more likely to have trouble maintaining supportive social networks and are at higher risk of school failure, gang membership, unemployment, poverty, homelessness, violent crime, incarceration, and becoming single parents. Furthermore, adults in this high-risk group who become parents themselves are less likely to be able to provide the kind of stable and supportive relationships that are needed to protect their children from the damages of toxic stress. This intergenerational cycle of significant adversity, with its predictable repetition of limited educational achievement and poor health, is mediated, at least in part, by the social inequalities and disrupted social networks that contribute to fragile families and parenting difficulties.

*Id.* at e237 (emphasis added). Mr. Torres is typical of what is more often seen in adults who, as children, where suffered from abuse and neglect.

> Few associations in the mental health literature are as well established as the relationship between child abuse and neglect and adverse psychological consequences among adults. Adults who report experiences of abuse and neglect as children, compared to those who do not, also report considerably higher rates of virtually every type of psychopathology, including depression, anxiety, drug and alcohol disorders, personality disorders, and generalized distress.

Allan V. Horwitz et al, *The Impact of Child Abuse and Neglect on Adult Mental Health: A Prospective Study*, JOURNAL OF HEALTH & SOCIAL BEHAVIOR (June 2001), at 184 (citation omitted).

Simply put, Mr. Torres, like many others, cannot simply choose to break free from his addictions or to simply get over his life experiences. Those aspects are part of who he is, and among the facts to be weighed in determining his sentence in accordance with 18 U.S.C. 3553(a).

Indeed, Mr. Torres's childhood was marred with instability. From birth, Mr. Torres's relationships with his parents was, at best, tumultuous. His father played a prominent role for about two to three years but otherwise was absent. See PSR, ¶¶ 52, 56. His mother had boyfriends, but that exposed Mr. Torres to witnessing his mother suffer physical abuse, leaving him feeling helpless because he "couldn't do anything to stop" it. PSR, ¶ 53. She used drugs, which Mr. Torres came to understand and eventually witness and, ultimately, use himself. ¶ 57. His mother was his primary codefendant in his prior federal case. Mr. Torres's grandmother had a prominent role, but her husband abused Mr. Torres's sister, ripping the family apart. PSR, ¶ 55.

Outside the home, life was not any more stable.

9

> Mr. Torres reported that he was raised in the North End of Hartford, where he experienced drugs, violence, gang activity, and other criminal activity typically associated with low-income housing areas. He would hear gunshots at night and witness drug use on the streets. Mr. Torres said he was not a victim of any violence. He said when he lived in the South End of Hartford the environment did not really change and it was also a bad neighborhood.

PSR, ¶ 54. Mr. Torres did not see school as a refuge, dropping out in 9th grade. PSR, ¶ 75. Instead, he found drug use and friends on the streets at an exceptionally early age. See PSR, ¶ 65.

His lack of education, his periods of incarceration, and his use of substances all have limited his ability to maintain employment that can raise him out of poverty. That should not be read to conclude that Mr. Torres has no interest in working. From the earliest meetings, Mr. Torres has referenced his work at Taco Bell and his hopes to have become a manager there. He recognizes that his failure at Taco Bell before returning in February, 2020, likely played a role in his conduct. While a sustainable living on that income may be a struggle, Mr. Torres's interest is a step in the right direction.

The instability of Mr. Torres's upbringing clearly contributed to his seeking refuge in substances and provided no focus or direction to which he could root himself. His struggle with substance abuse has been a lifelong one that he has often failed, and likely a contributing factor in nearly every arrest and conviction. He has been willing to participate in treatment, and he recognizes that he continues to need help. Mr. Torres has had successes and failures in treatment, and he has expressed interest in returning to treatment when he reaches the BOP.

Recognizing the tumultuousness of his past, Mr. Torres needs a better post-release plan. He plans to return to his girlfriend and to continue their family. The conditions

recommended by the Probation Office, see PSR, ¶ 115, will be important to promoting his rehabilitation and, to some extent, deterring him from returning to criminal conduct. The Court should consider including conditions that he observe Reentry Court and/or Support Court upon his release and review with his supervising probation officer the benefits of participating in those programs, which also would afford a greater level of supervision.

The Court may also want to include a condition that Mr. Torres appear for a compliance review hearing within some defined period of time following his release from the BOP to check on his progress. If he is working and substance-free, great; the hearing could be used to further encourage him and to consider options going forward. If there is a problem or need for services not covered by the conditions in place, Mr. Torres will be reminded of the Court's interest in his success but also that something far short of the instant conduct could warrant a return to prison.

      C.      **The Goals And Purposes Of Sentencing Require Balancing All Factors And Not Just Focusing On Punishment and Deterrence.**

In 18 U.S.C. § 3553(a)(2), Congress set forth an array of policy goals to be implemented in sentencing. First, this subsection lists "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." This factor requires that the Court consider the purpose of punishment, while maintaining the integrity of the criminal justice system.

A sentence in the Guidelines range should suffice to serve this purpose and to deter Mr. Torres. He has been reintroduced to the federal criminal justice system and will experience separation from his family; he is likely to be held at a BOP facility away from them, and his girlfriend does not have the resources to make regular visits to an institution, even if it is FCI Danbury. The deterrence factor, and to some extent punishment, will be felt

11

and, hopefully, intertwined with rehabilitation while Mr. Torres serves a term of supervised release.

A concurrent term for at least a portion of the sentence imposed for violating supervised release will not undermine the law, punishment, or any sentencing factors. As discussed *infra*, courts are recognizing that the prison conditions created by the pandemic warrant recognition. While this case clearly is not suitable for compassionate release (for example, Mr. Torres has yet to be sentenced), the circumstances that have warranted reductions in sentences or lesser sentences are no less entitled to consideration.

Mr. Torres, while previously on supervised release,[1] had a mixed experience. He tested positive for substances and was arrested previously. The instant offense came somewhat late in the term, as he was due to terminate on March 22, 2021. He completed MRT, leading to a nolle prosequi in state court, and had periods of employment. Going forward, his next term of supervised release can address recidivism concerns by requiring ongoing substance abuse and mental health treatment, and by requiring that he work or obtain vocational training on a full-time basis.

### D. In Considering 18 U.S.C. 3553(a)(4), The Court Should Impose A Term In The Guidelines Range With At Least A Partially Concurrent Sentence For His Violation Of The Conditions of Supervised Release.

The Court should use the Guidelines range set forth in the plea agreement. The PSR found a criminal history category of IV, due to a point total of 7, *i.e.*, the lowest point total in

---

[1] Federal law acknowledges that prison is not really designed for rehabilitation. See 18 U.S.C. § 3582 ("The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation."); *see United States v. Pallowick*, 364 F. Supp. 2d 923 (E.D. Wisc. 2005) (departing from 70-87 months to 46 months where defendant was convicted of six armed bank robberies because, inter alia, lengthy incarceration would inhibit rehabilitation).

CHC IV.  In *United States v. Fernandez*, 877 F.2d 1138, 1144 (2d Cir. 1989), the Court of Appeals observed that "discretionary power to depart from the Guidelines may be especially important" in cases with a plea agreement because otherwise "the widespread practice of plea bargaining [would become] unworkable." It reasoned that a person would "have far less incentive to plead guilty at the outset" if the parties' expectations were altered on the day of sentencing. *Id.* And Congress, in adopting the Sentencing Reform Act, had no intention of weakening the widespread system of plea bargaining, despite the Guidelines' failure to explicitly consider this factor. *Id.* Because the Sentencing Commission has not yet fully considered plea bargaining as a factor in shaping the Guidelines, a district court retains discretion to depart to give effect to the plea bargain.  *See id.* at 1145.  The Court of Appeals has on many occasions, including recently, emphasized the importance of respecting the plea-bargaining process.  *See United States v. Wilson*, 920 F.3d 155, 158 (2d Cir. 2019) (holding that government breached plea agreement by arguing for additional sentencing enhancements in response to draft PSR).  The Court should apply that reasoning here and depart to the range in the plea agreement.[2]

On balance, a Guidelines sentence should suffice.  The range captures his offense conduct and his criminal history.  That history does not warrant an upward departure, and to the extent that the Government argues otherwise, any movement in an upward direction is

---

[2] The discrepancy in the calculation appears to arise from the two points attributed to Mr. Torres's 2010 sentence of time served for conviction for possession of narcotics.  In the current PSR, the Probation Office assesses two points for the time served sentence, assuming that that term accounts for Mr. Torres entering into custody on March 26, 2010, and then being sentenced on June 9, 2010.  See PSR, ¶ 41.  The prior PSR in the 2012 case only assessed one point, which, if applied to the instant case, would drop the point total to 6 and criminal history category to III.  Ensuring consistency in the two proceedings further supports departing to the range in the plea agreement.

countered by the mitigating factors, including Mr. Torres's unstable childhood and struggles in school and with substance abuse.

The Court also should recognize that the pandemic renders the imposition of a fully consecutive prison term for the supervised release violation unwarranted. There is an emerging consensus that sentences served under the specter of COVID-19 are harsher than ordinarily contemplated. Courts are recognizing that "the factor relating to the 'need for just punishment' has dramatically shifted" during the COVID-19 pandemic. *United States v. Indarte*, 2020 U.S.Dist. 189970, 12, 2020 WL 6060299, 4 (W.D. Wash. Oct. 14, 2020).

At 5'7" and 220 pounds, the CDC BMI calculator indicates that Mr. Torres's BMI is 34.5, rendering him obese and more susceptible to severe complications should he contract COVID-19. Hopefully, that risk will lose its importance in the coming months, but until there is widespread vaccination within the prison system, Mr. Torres will have to continue to endure harsher prison conditions and fewer opportunities for rehabilitative programming. Those institutional consequences are on top of having to live day to day with the uncertainty about his well-being and worries about the health of his family.

One court observed that "[h]igh-risk defendants living in fear during a COVID-19 outbreak in their facility experience an incarceration significantly more laborious than before COVID-19. The laborious nature of this incarceration causes the § 3553(a) factors to favor release before the defendant has served his or her full sentence." *United States v. Little*, 2020 U.S.Dist. 90860, 5, 2020 WL 2613034, 2 (N.D. Ohio May 23, 2020) citing *United States v. Beck*, No 1:13-cr-186-6, 425 F.Supp.3d 573, 2019 U.S.Dist. LEXIS 108542, 32 (M.D.N.C. June 28, 2019); *see also United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y.

14

2020) (acknowledging the "seriousness and duration of [the individual's] criminal conduct," but noting "the environment where [the individual] is serving his sentence" changes things).

Even prior to Covid-19 the Seventh Circuit recognized:

> In effect Schullo is arguing that the severity of a prison sentence has two dimensions: its length, and the harshness of the conditions, and that the harsher the conditions the shorter the sentence should be. *There is enough merit to the argument to allow a sentencing judge to take it into account*, *Koon v. United States*, 518 U.S. 81, 111-12, 116 S. Ct. 2035, 135 L. Ed. 2d 392 (1996), but not enough merit to make a judge who refuses to do so unreasonable, at least when the sentence he imposes is within the guidelines range.

*United States v. Spano*, 476 F.3d 476, 479 (7th Cir. 2007) (emphasis added). The circumstances in the prisons, with facilities battling waves of outbreaks, simply were not contemplated by the Guidelines but courts have recognized the reality of the situation.

Mr. Torres has been detained at Hartford Correctional Center since his arrest. That facility has not been spared. The DOC reports 5 asymptomatic inmates at HCC as of today, and that the facility has had 366 inmate positives.[3] Conditions have been more restrictive, with visits often prohibited and movements within the facility limited. While release would not be appropriate here, these circumstances weigh in favor of a below-Guidelines sentence, or for the Court to exercise the discretion available in imposing a term for Mr. Torres's violations of the conditions of his supervised release. Accordingly, Mr. Torres requests a 48-month prison term, with a 24-month term for his violation, 12 months of which to be served concurrently.

---

[3] DOC tracking information is available at https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Health-Information-and-Advisories.

15

## **CONCLUSION**

For the foregoing reasons, Mr. Torres respectfully requests that the Court impose a sentence in the Guidelines range reflected in the plea agreement, 48 months, followed by three years of supervised release, and with no fine imposed.  Mr. Torres will pay the special assessment while working within the BOP.  Mr. Torres requests that the Court impose conditions of supervised release that will promote his employability and treat his clear needs for substance abuse and mental health treatment.

On the violation of supervised release, Mr. Torres requests that the Court impose a term of 24 months, of which 12 months will be imposed concurrently, due to the impact of the pandemic on Mr. Torres's prison time.  The pandemic has indisputably made prison time more punitive and reduced opportunities for rehabilitation.  A total effective sentence of 60 months will account for that impact, which is not addressed by the Guidelines, as well as sufficiently meet the purposes of sentencing.

Respectfully submitted,

JONATHAN TORRES

/s/Charles F. Willson/s/_____
By Charles F. Willson (# ct24129)
FEDERAL PUBLIC DEFENDER'S OFFICE
10 Columbus Boulevard, 6th Floor
Hartford, CT 06106
Tel:    (860) 493-6260
Fax:    (860) 493-6269
email: Charles_Willson@fd.org

## CERTIFICATE OF SERVICE

      This is to certify that on February 22, 2021, a copy of the foregoing was filed electronically via the Court's CM/ECF system, and by that system, counsel for the Government has been provided with a copy of the foregoing.

/s/Charles F. Willson/s/_____
Charles F. Willson